IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DORA LEIGH EASTERWOOD,          )
wife and personal representative of   )
the Estate of Horace Melton,        )
deceased,                          )
                                   )
          Plaintiff,               )
                                   )
     v.                            )          CASE NO. 2:19-CV-1065-WKW
                                   )                 [WO]
HUSQVARNA PROFESSIONAL         )
PRODUCTS, INC., and               )
HUSQVARNA CONSUMER            )
OUTDOOR PRODUCTS N.A., INC.,    )
                                   )
          Defendants.              )

## MEMORANDUM OPINION AND ORDER

Before the court are three motions: Defendants' Motion to Exclude Certain Opinions of Plaintiff's Expert Thomas Berry (Doc. # 41), Defendants' Rule 702 Motion to Exclude Plaintiff's Cause of Death and Injury Opinions (Doc. # 42), and Defendants' Motion for Summary Judgment (Docs. # 43, 44). Plaintiff has responded to each of the three motions, (Docs. # 47, 48, 49, 50), and Defendants have filed replies (Docs. # 52, 53, 54). For the reasons stated below, Defendants' Motion to Exclude Certain Opinions of Plaintiff's Expert Thomas Berry is due to be granted in part and denied in part; Defendants' Rule 702 Motion to Exclude

Plaintiff's Cause of Death and Injury Opinions is due to be granted; and Defendants' Motion for Summary Judgment is due to be granted in part and denied in part.

## I.  JURISDICTION AND VENUE

Subject matter jurisdiction is proper under 28 U.S.C. § 1332.  The parties do not contest personal jurisdiction or venue.

## II.  BACKGROUND[1]

A Zero Turn Mower ("ZTR") is a riding lawn mower with a turning radius that is effectively zero because the two drive wheels can rotate in opposite directions, controlled by separate push-pull handles.  On April 6, 2018, Horace "Randy" Melton was operating a Husqvarna MZ5225ZT ZTR while doing landscaping work for Linda and Warren "Gene" Lawrence in Tallassee, Alabama, when the ZTR flipped over and Mr. Melton perished underneath it.  (Doc. # 50-1 at 4.)

Mr. Melton owned and operated a construction company and was an experienced user of ZTRs and construction equipment.  (Doc. # 44-3 at 6.)  He personally owned a Husqvarna ZTR, but was using a Husqvarna ZTR owned by the Lawrences on the day of the accident.  (Doc. # 44-3 at 6.)  Mr. Melton was familiar with the layout of the Lawrences' property, having been employed by the Lawrences

---

[1] For summary judgment purposes, the facts are stated in the light most favorable to Plaintiff, the non-moving party.  *See Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

for some time.  In fact, Mr. Melton was the one who built the gazebo structure that he came into contact with as the ZTR overturned.  (Doc. # 44-3 at 6.)

The Lawrences' property sits on the banks of Lake Martin.  (Doc. # 44-5 at 8.)[2]  In the northeastern corner of the property, along the shoreline, runs a walkway leading to a wooden dock and gazebo structure.  (Doc. # 44-3 at 35.)  The hill above the walkway is held up by a stone retaining wall, creating a grassy "shelf" approximately ten feet by one hundred feet.  (Doc. # 50-1 at 5.)  The upper parts of the shelf are sloped downward, toward the water, approximately fifteen degrees.  (Doc. # 50-1 at 5.)  The slope increases to approximately forty-five degrees further down the hill, toward the retaining wall.  (Doc. # 50-1 at 5.)  The gazebo structure sits directly below one end of the retaining wall, with the roof rising about four and a half feet above the wall.  (Doc. # 50-10 at 19.)

Mr. Melton had historically used a walk-behind mower and a weed eater to mow the grassy shelf, and both were available to him that day.  (Doc. # 44-3 at 44, 58.)  However, Mr. Melton chose to mow the grassy shelf with the ZTR.  While his co-worker was working out of sight, Mr. Melton began mowing lengthwise along the back of the grassy shelf, starting on the end opposite to the gazebo.  (Doc. # 44-3 at 37.)  As he moved along the shelf, the retaining wall and lake were on Mr.

---

[2] In this opinion, citations to depositions use pincites based on the deposition page numbers. All other citations use the pagination of the PDF in the court's electronic filing system.

Melton's left and to his right were the trees and the back of the shelf.  When Mr. Melton reached the gazebo end of the shelf, he inexplicably turned left onto the steeper part of the slope and off the edge of the grassy shelf.  (Doc. # 44-3 at 6.)  He attempted to reverse the ZTR back onto the flatter part of the grassy shelf, but he lost traction and began sliding downhill.  (Doc. # 44-3 at 6.)  The right rear tire obtained some traction, rotating the ZTR clockwise during the slide, but it was not enough to arrest the descent.  (Doc. # 50-1 at 6.)  As the ZTR slid onto steeper and steeper parts of the slope, it hit a rock embedded in the hillside and overturned.  (Doc. # 44-3 at 6, 34.)  The ZTR landed upside-down, wedged between the gazebo structure, the retaining wall, and the steep hillside above the retaining wall.  (Doc. # 44-3 at 13.)  Although at least some of the ZTR's weight was supported by the hill, the retaining wall, or the gazebo (Doc. # 44-8 at 65), Mr. Melton was trapped beneath the ZTR.  (Doc. # 44-16 at 8.)

A neighbor, standing across the water—some 700 to 900 feet away—heard shouting from the Lawrences' property.  (Doc. # 44-16 at 5.)  He heard someone calling out "Help!" seven times, followed by silence.  (Doc. # 44-16 at 5.)  Although the neighbor could not see the origin of these cries, he decided to investigate.  However, because of the geography of the Lake Martin area, he had to drive more than two and a half miles to get to the Lawrences' property, arriving ten to twelve minutes after he heard the yelling.  (Doc. # 44-16 at 5.)  When the neighbor and the

homeowner found Mr. Melton, he showed no signs of life. (Doc. # 44-16 at 5–6.) Initial attempts to lift the ZTR off Mr. Melton's body were unsuccessful. (Doc. # 44-16 at 5–7.)

Mr. Melton's body displayed bruising in his chest area and a significant laceration on his head. (Doc. # 44-16 at 10.) No autopsy was conducted. (Doc. # 44-16 at 12.) The certificate of death, prepared by Brad Linville, the coroner of Elmore County, states that Mr. Melton's cause of death was "blunt chest asphyxiation" and lists an "eyebrow laceration with possible loss of consciousness" under "other significant condition contributing to death." (Doc. # 44-16 at 12.)

On December 19, 2019, Dora Leigh Easterwood, Mr. Melton's wife, brought this wrongful death action on behalf of her late husband against Husqvarna Professional Products, Inc., and Husqvarna Consumer Outdoor Products N.A., Inc. (collectively "Husqvarna" or "Defendants"). Plaintiff alleges that Defendants, in designing, manufacturing, selling, or promoting the ZTR, violated the Alabama Extended Manufacturer's Liability Doctrine (Count I), the Alabama common law of negligence (Count II), and the Alabama common law of wantonness (Count III).

### III.  MOTION TO EXCLUDE TESTIMONY OF THOMAS BERRY

Plaintiff has retained Thomas Berry as an expert witness for this case. Mr. Berry received a undergraduate degree in mechanical engineering and a Master of Science in mechanical engineering from Wichita State University. He is a licensed

engineer and has been for over thirty years. He is a member of the American Society of Mechanical Engineers, the American Society of Agricultural Engineers, and the Society of Automotive Engineers. Mr. Berry has "designed, tested, and certified many roll-over protective structures and seatbelts for tractors, ride on mowers, and ZTRs for several major manufacturers of rollover protective structures (ROPS), as well as for some specific manufacturers." (Doc. # 50-10 at 3.) Mr. Berry has approximately forty years of experience in tractor design and safety analysis and engineering.

Mr. Berry has offered several opinions in his expert report and deposition testimony. (Doc. # 47 at 1–4.) Defendants have moved to exclude the following six:

- Husqvarna should have designed the ZTR with a Rollover Protection Structure (ROPS) as standard rather than optional equipment;
- Husqvarna knew or should have known that it should have made ROPS a standard safety feature and willfully and without regard for the public sold the ZTR without ROPS;
- The ZTR was being used in a foreseeable manner at the time of crash;
- ZTR users would not be expected to appreciate the risk of rollovers or the risk of using it without a ROPS;
- An alternative warning would have prevented Melton's death;
- ROPS "have proven 99% effective" in preventing or minimizing serious injuries and deaths in ZTRs.

(Doc. # 41 at 7–8.)

Defendants, in their first motion, do not challenge Mr. Berry's qualifications generally.  (Doc. # 41 at 10 n.3.)  Defendants simply argue that these opinions are not based on any reliable methodology, do not fit the facts of the case, or will not help the jury.

A.    **Standard of Review**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 assigns the trial court a gatekeeping role to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589, 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) ("[T]he Federal Rules of Evidence 'assign to the trial judge the task of ensuring that an expert's testimony rests both on a reliable foundation and is

relevant to the task at hand.'" (quoting *Daubert*, 509 U.S. at 597)).  This gatekeeping responsibility is the same when the trial court is considering the admissibility of testimony based upon "'technical' and 'other specialized knowledge.'"  *Kumho Tire*, 526 U.S. at 141 (quoting Fed. R. Evid. 702).

Considering *Daubert*'s "gatekeeping requirement," the Eleventh Circuit requires district courts to engage in a "rigorous three-part inquiry" for assessing the admissibility of expert testimony under Rule 702:

> Trial courts must consider whether:  "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). These requirements are known as the "qualifications," "reliability," and "helpfulness" prongs.  *See id.*

"The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion."  *Id.*  And the proponent must meet its burden by a preponderance of the evidence.  *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009); *see also Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999) ("The burden of laying the proper

8

foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." (citing *Daubert*, 509 U.S. at 592 n.10)).

As to qualifications, "experts may be qualified in various ways," including by scientific training, education, and experience. *Frazier*, 387 F.3d at 1260–61. "Whether a proposed expert's experience is sufficient to qualify the expert to offer an opinion on a particular subject depends on the nature and extent of that experience." *United States v. Cunningham*, 679 F.3d 355, 379 (6th Cir. 2012). "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note to 2000 amendments.

Courts must also be mindful that "[e]xpertise in one field does not qualify a witness to testify about others." *Lebron v. Sec'y of Fla. Dep't of Children & Families*, 772 F.3d 1352, 1368 (11th Cir. 2014). But "[s]o long as the expert is at least minimally qualified, gaps in his qualifications generally will not preclude admission of his testimony, as this relates more to witness credibility and thus the weight of the expert's testimony, than to its admissibility." *Henderson v. Goodyear Dunlop Tires N. Am., Ltd.*, Nos. 3:11-CV-295-WKW, 3:12-CV-510-WKW, 2013

WL 5729377, at \*6 (M.D. Ala. Oct. 22, 2013) (quoting *Trilink Saw Chain, LLC v. Blount, Inc.*, 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008)).

As to reliability, trial courts retain "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire*, 526 U.S. at 152. The focus of reliability "must be solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595. After all, "*Daubert* does not require certainty; it requires only reliability." *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1198 n.10 (11th Cir. 2010). But district courts may reject expert testimony that is based on sound methodology when "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Finally, whether the expert testimony will assist the trier of fact in understanding the evidence or a fact in issue "goes primarily to relevance." *Daubert*, 509 U.S. at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (citation and internal quotation marks omitted). Moreover, "[o]nce an expert opinion has satisfied *Daubert*, a court may not exclude the opinion simply because it believes that the opinion is not — in its view — particularly strong or persuasive." *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 990 (11th Cir. 2016). Where the basis of expert testimony satisfies Rule 702, "[v]igorous cross-examination, presentation of contrary evidence, and

careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

**B.    Discussion**

> ### 1.    *Opinion on ROPS as Standard Versus Optional Equipment*

As to the first challenged opinion, the scope of the dispute is unclear.  Mr. Berry's expert report never specifically says that Defendants should have offered ROPS as standard rather than optional equipment.  However, it does discuss the use of ROPS as "standard equipment" by other manufacturers or on other models.  (Doc. # 41-1 at 8, 13, 16–19, 23–26.)  More critically, Defendants refer to the following exchange at Berry's deposition:

> Counsel for Defendants:  For purposes of your opinions today, I mean, isn't your—your opinion is that ROPS should have been standard; correct?
> A.  Yes.
> Q.  So, I mean, the fact that language talking about it as an accessory is not really relevant to your opinions in the sense that your opinion is it should have been standard equipment, not marketed as—marketed differently as an option; correct?
> A.  True.  But if you want somebody—if you have a safety device and the only person—that safety device to prevent serious injuries and death, and you want, you know, people to know it's there and available to protect them, you really need to advertise the same.  That's not near as good as providing it as standard equipment, but it's better than doing nothing.
> Q.  But I guess what I'm getting at for purposes of this case is, your opinion is it should have been standard, not that it should have been marketed differently as an option?
> A.  That's correct.  I mean, they make you buy the props mount.  You had to buy the seatbelt mount.  But they didn't make you buy the ROPS and seatbelt.

(Doc. # 41-4 at 178–79.)

Defendants move to exclude this opinion because the jury does not "require Mr. Berry's assistance to determine whether ROPS should be standard or optional." (Doc. # 41 at 11.)  Plaintiff responds that she does not intend to offer "the opinion that ROPS should have been made standard equipment" at trial, that Mr. Berry only so opined because he was asked by Defendants at deposition, and that Mr. Berry is instead "offering the opinion that the product is defective because it lacked ROPS." (Doc. # 47 at 8.)  Defendants state that this is not a "meaningful distinction" and that Mr. Berry's report contains opinions regarding what Defendants "should have installed."  (Doc. # 52 at 3.)

The parties' fixation on "standard" versus "optional" equipment has uncertain origins.  Defendants sold and decedent used a ZTR without ROPS.  Mr. Berry's opinion—and Plaintiff's claim—is that the ZTR is defective without ROPS.  The availability of ROPS may be relevant to causation—*i.e.*, Mr. Melton's choice to not put ROPS on his own ZTR might show that Mr. Melton would not have deployed ROPS had it been installed on the subject ZTR—but it is not relevant to whether the product was sold in a defective state.  Thus, Defendants are correct in saying that there is no meaningful distinction between the opinion that Defendants should have sold the ZTR with ROPS as standard rather than optional equipment, and the broader opinion that the ZTR is defective unless ROPS is installed by the manufacturer.  Both

are substantially the same as the opinion excluded by this court in Part IV.A.1. of *Rockhill-Anderson v. Deere & Co.*, 994 F. Supp. 2d 1224, 1235 (M.D. Ala. 2014).

Mr. Berry can provide qualified and helpful testimony to the jury on the risks and utility of ROPS. However, the conclusion that the ZTR was defective, as well as the corresponding opinion that ROPS "should have been included," are not helpful. Determining whether a product is defective involves more than just identifying the risks and utility of the proposed modification, and ultimate decision of whether the modification "should have been included" is therefore beyond Mr. Berry's qualifications. He is not qualified in cost-benefit analysis, and he is not qualified in overall product design, market research, or any number of other areas that may play into the cost-benefit analysis. The risks and utilities within Mr. Berry's expertise may not be the only risks and utilities that need to be considered.

Although an opinion on an ultimate issue is not automatically objectionable, *see* Fed. R. Civ. P. 704, Mr. Berry's opinion does not meet the requirements of Rule 702 and would be unhelpful to the jury.

### 2. *Opinion on What Husqvarna "Knew" About ROPS*

Mr. Berry's expert report and deposition testimony discuss the risks known to the industry at the time the ZTR was manufactured. However, Mr. Berry occasionally strays from what the *industry* knew to commenting on what *the*

*Defendants* knew or should have known.  (Doc. # 41-1 at 27–28.)  Plaintiff again

attempts to draw a distinction between *Rockhill-Anderson* and this case, saying that:

> Mr. Berry will not be offering any opinions as to whether the Defendant's conduct was willful or what the Defendant's "intent or motive was" in failing to place a ROPS on the subject tractor.  However, Mr. Berry will testify . . . that, as a member of the manufacturing industry, the Defendants should have known about what data and information was available regarding the efficacy of ROPS in preventing deaths and serious injuries. . . .  [C]onsistent with *Rockhill-Anderson*, Mr. Berry will not testify as to what Husqvarna's actual knowledge or intent was.

(Doc. # 47 at 9.)

Testimony about what Defendants "should have known" is not consistent with

*Rockhill-Anderson* or the Federal Rules of Evidence.  The testimony is beyond Mr.

Berry's expertise, and "the jury does not need Mr. Berry's expert opinion to help

them understand the evidence relating to the issue of [Defendants'] knowledge."

*Rockhill-Anderson*, 994 F. Supp. 2d at 1238.

Mr. Berry may testify as to what was known in the industry.  Additionally, if

Mr. Berry has any specific information regarding Husqvarna's contributions to

safety research, Husqvarna's participation at meetings, conferences, or institutes, or

other similar evidence that might be relevant for the *jury* to assess Husqvarna's

corporate knowledge, he may testify as to that evidence.  Mr. Berry may not,

however, provide his own conclusions as to what Husqvarna "knew" or "should have

known."  The jury is capable of taking that final step on their own.  This part of Defendants' motion is due to be granted.

### 3.   Opinion on the Hidden Danger of the Mower and on the Foreseeability of the Misuse

These two topics are grouped together by the parties because they share similar issues.  Defendants move to exclude Mr. Berry's opinion that ZTR users "would not expect the machine to be as dangerous as it was" and his opinion that the ZTR "was being used in a foreseeable manner and in a foreseeable environment of use by Mr. Melton at the time of the accident."  (Doc. # 41-1 at 27–28.)  Mr. Berry believes that consumers regularly use ZTRs on slopes and do not perceive the danger of slopes as steep as fifteen to twenty degrees.  (Doc. # 41-1 at 7.)

First, Defendants argue that the dangerousness of ZTR slope operations was sufficiently revealed—and thus the foreseeability of consumers using the ZTR on slopes was abated—by the warnings on the ZTR and in the operator's manual.  (Doc. # 31 at 13–15.)  Second, Defendants cite four cases and claim that "whether a consumer product is more dangerous than [consumers] would expect" and "foreseeability" are jury questions that expert witnesses should not be permitted to opine on.  (Doc. # 41 at 15.)  Third, Defendants argue that Mr. Berry's opinion on foreseeability is an opinion regarding Defendants' state of mind.  (Doc. # 41 at 15–16.)  Fourth, Defendants argue that Mr. Berry's opinions are not based on any study

of *Defendants'* ZTR, but rather on other studies and anecdotal evidence.  (Doc. # 41 at 16–17.)

Plaintiff's response highlights the basis for Mr. Berry's opinions.  Plaintiff and Mr. Berry cite an array of reports and studies from the Consumer Product Safety Commission, industry leaders, and other researchers, which have found that users tend to overestimate a ride-on mower's ability to handle slopes.  (Doc. # 50-10 at 16.)  Mr. Berry cites numerous studies revealing a general rollover problem with riding mowers, and a least one study suggesting that ZTRs are subject to similar risks.  (Doc. # 50-10 at 5.)  Plaintiff also argues that the presence of warning labels is "determinative" evidence that the misuse was foreseeable.  (Doc. # 47 at 13.)

Defendants, in reply, argue that the use of warnings as evidence of foreseeability is "nonsensical, circular, not based upon any scientific or technical expertise, contrary to law, and would only serve to confuse rather than assist the jury in making its findings."  (Doc. # 52 at 7.)

Neither party correctly applies Rule 702 to these two opinions.  First, the presence of warnings of the ZTR and in the operator's manual does not foreclose the opinions that Mr. Berry seeks to deliver.  Even with proper warnings given to the consumer, Mr. Berry could still have a solid basis for concluding that users ignore those warnings and operate ZTRs on slopes as great as twenty degrees.  Second, the cases cited by Defendants *do* say that foreseeability and dangerousness are jury

questions.  *See Rockhill-Anderson*, 994 F. Supp. 2d at 1236; *Rudd v. Gen. Motors Corp.*, 127 F. Supp. 2d 1330, 1333 (M.D. Ala. 2001); *Hail v. Regency Terrace Owners Ass'n*, 782 So. 2d 1271, 1275 (Ala. 1999); *Braun v. Soldier of Fortune Mag.*, 749 F. Supp. 1083, 1086 (M.D. Ala. 1990).  However, they *do not* say that the jury must answer this question without the aid of expert testimony.  Indeed, expert testimony almost always seeks to provide assistance in answering jury questions.  *See* Fed. R. Evid. 702(a) ("[T]he . . . knowledge will help the trier of fact to understand the evidence or to determine a fact in issue . . . .").

        The question is how far Mr. Berry can go with his testimony in these two areas.  Defendants structure their motion as a challenge to Mr. Berry's methodology and not to his qualifications, but the truth is that the qualifications need to be examined.  The first reason is that Mr. Berry's report contains many opinions on legal issues or corporate issues that are outside of his expertise.  The second reason is that his *experience* gives him a *method* for answering engineering questions, in a way that experts in other fields might not be able to do.

        As a preliminary matter, Mr. Berry has a reliable basis for concluding that the ZTR and other ride-on mowers are comparable enough to use the rollover data and consumer feedback for ride-on mowers in forming his opinion regarding ZTRs.  Mr. Berry relies on some outside research regarding ZTR rollovers (Doc. # 50-10 at 5), but his personal engineering analysis of the two vehicles is also a reliable way to

determine whether the two vehicles are comparable enough to make this connection. Defendants argue at length in a later section of their brief that the different characteristics of the vehicles make them incomparable. (Doc. # 41 at 21–23.) However, Mr. Berry provides a basis for the comparison in his expert report:

> Few designs are so new and different that accident history of other predecessor and competitor models would not be applicable. All of the riding lawn mowers and lawn tractors whether front mount, ZTR lawn tractors or more conventional lawn tractors are covered by the same stability requirements of ANSI B71.1 or B71.4. They all have a similarly sized operator areas (sic.) since similarly sized users will operate them. They all will be operated by users with similar abilities and faults. With respect to this lawn tractor there is nothing unique about its size, shape or design that would lead a knowledgeable engineer to believe that rollovers would not occur as they had with other mowers in the past with devastating results to operators.

(Doc. # 50-10 at 34.)

This personal analysis is a reliable methodology and is within Mr. Berry's expertise. Defendants' disagreement with Mr. Berry's opinion as to the comparability of the two products is best left for cross-examination and the jury. Therefore, based on the cited studies, Mr. Berry can reliably opine that ZTRs are often used in sloped environments and that users generally overestimate the ZTR's ability to handle slopes.

Lastly, Defendants are correct that Mr. Berry's use of "foreseeable" language ventures too far into the field of corporate knowledge. Plaintiff did not respond to this argument. Mr. Berry may testify, if properly supported, that the misuse was

known in the industry.  However, he may not testify that Husqvarna did foresee or should have foreseen the misuse.  The jury can decide the issue without the aid of expert testimony.

### 4.      Opinion on the Defective Nature of the Warnings

Mr. Berry is not a warnings expert.  Neither the materials submitted by Mr. Berry (Doc. # 50-10) nor Plaintiff's summary of Mr. Berry's qualifications (Doc. # 47 at 24–27) includes any basis for concluding that Mr. Berry has expertise in warnings.  He did not draft or test alternative warnings, and he therefore has no reliable basis for concluding that the ZTR's warnings were defective.

Nonetheless, this court has recently ruled in another context that an expert who is qualified to identify the risks in a product is also qualified to deliver limited commentary on the product's warnings.  That same philosophy applies here.  Mr. Berry "is qualified to testify as to the risks of the [ZTR], whether those risks were fully explained [in the product's warnings], and therefore whether the [warnings] can be described as complete or accurate."  *Ruberti v. Ethicon*, No. 2:20-CV-874-WKW, 2021 WL 5570109, at *8 (M.D. Ala. Nov. 29, 2021).  However, Mr. Berry may not present an alternate warning or engage in a warning redrafting exercise.  In other words, Mr. Berry may identify the risks that were not communicated or inaccurately communicated, but he may not opine as to how those risks ought to have been communicated.

19

For example, his opinion that "Husqvarna should have had a warning on both the mower and in the owner's manual that told its consumers and operators of the mowers of the dangers and risks of rollovers without ROPS and that Husqvarna should have had language in both strongly recommending the purchase of ROPS," (Doc. # 50-10 at 10), does not fall within his expertise and is not supported by any reliable methodology.

### 5.   *Opinion on the Statistical Effectiveness of ROPS*

As discussed above, Mr. Berry has a reliable basis for using the data from other mowers in forming his opinions on ZTRs.  The specific question still at issue is whether Mr. Berry can use *statistics* from studies of other products in his testimony to the jury.  Defendants first challenge Mr. Berry's opinion that "ROPS including seatbelts have proven 99% effective on all models of tractors and ride-on mowers in preventing and/or minimizing deaths and serious injuries due to rollovers."  (Doc 50-10 at 37.)  Second, Defendants challenge Mr. Berry's opinion that rollovers are the "number one cause" of death on ZTRs.  Third, when asked whether he did a "scientific study" to determine the percentage of accidents attributable to rollovers, Mr. Berry responded:  "I haven't put a percentage to it.  You know, it's got to be 90 percent from what gets reported of what I've seen, but I've never calculated a percent." (Doc. # 41-4 at 188.)  Defendants take issue with the 90 percent estimation.

Without any studies specifically looking at ZTRs, it is at least misleading to say that "ROPS including seatbelts have *proven* 99% effective on *all models* of . . . ride-on mowers." Mr. Berry may not state or imply a statistical certainty for something that has never been tested. (Doc. # 50-10 at 6 ("I know of no published studies available in the industry that looked only at ZTR mowers. They do not exist. I relied upon the data that was available in the industry.").) More nuance is needed to pass Rule 702 muster.

Mr. Berry may testify that ROPS has prevented deaths and serious injuries due to rollovers on *other* tractors and ride-on mowers—and, further, that he believes that ZTRs would see similar benefits—but he may not attach an unsupported statistical certainty to that opinion.

Whether rollovers are the "number one cause" of death is less demanding of statistical support. Deaths due to ZTRs are infrequent, (Doc. # 41-4 at 187), and rollovers account for an overwhelming majority of the deaths, (Doc. # 41-4 at 188). It does not take a scientific study to conclude that rollovers are the "number one cause" of deaths on ZTRs. Mr. Berry's process for reaching his conclusion—reading the incident reports for the incidents that he is made aware of—is reliable enough for Rule 702 purposes.

Lastly, it is unclear whether Plaintiff intends to offer the "90 percent" statistic at trial. The number is not found in Mr. Berry's expert report and was only brought

up as an estimation at Mr. Berry's deposition.  In any case, the statistic has no methodological basis and does not bring any value to Mr. Berry's testimony.  It does not meet the requirements of Rule 702 and is due to be excluded on that basis.

### IV.  MOTION TO EXCLUDE CAUSE OF DEATH OPINIONS

Defendants have moved to exclude the cause of death opinions of two of Plaintiff's witnesses, Mr. Berry and Brad Linville, the Elmore County Coroner. Both have opined that the death was due to blunt chest asphyxiation.

**A.    Standard of Review**

This motion is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), as explained above.

**B.    Discussion**

**1.    *The Coroner's Opinion on Cause of Death***

Defendants have moved to exclude Mr. Linville's testimony on the basis that Mr. Linville is an elected official with no medical or forensic training, that he has never performed an autopsy and is not qualified to perform one, and that Mr. Linville admitted that he was unsure about the conclusions listed in the death certificate. (Doc. # 42 at 11–13.)  Plaintiff responds that:

> Plaintiff has not offered Elmore County Coroner Brad Linville as an expert in this case.  Plaintiff does not intend to call Mr. Linville as an expert in this case.  Mr. Linville would be a fact witness to testify as to what he observed at the scene, his investigation as a coroner and possibly to authenticate the death certificate, if needed.

(Doc. # 48 at 1.)

As Plaintiff appears to concede this part of the motion, it is due to be granted. Mr. Linville will not be permitted to offer opinion testimony as to the cause of death.

### 2.   *The Death Certificate*

Despite conceding that the author of the death certificate is not qualified to determine a cause of death, Plaintiff argues in her response that the death certificate itself is *prima facie* evidence of the cause of death under Alabama law that ought to create a rebuttable presumption as to the cause of death in this case.  (Doc. # 48 at 1–3.)  Defendants oppose this assertion.  (Doc. # 53 at 3–5.)

The original *Daubert* motion did not ask to exclude the death certificate. Ruling on this issue would therefore be procedurally improper.  The parties may reassert this issue in an appropriate form on a later date.  The parties should identify and specifically cite any sources that answer (1) whether a cause of death is a "fact[]" within the meaning of Alabama Code § 12-21-101 and (2) whether § 12-21-101 is substantive state law that applies in federal court.

### 3.   *Thomas Berry's Opinion on Cause of Death*

Mr. Berry, an expert in ROPS and rollover incidents, is qualified to testify only in his areas of expertise.  His analysis of the crash sequence is reliable and helpful to the jury.  His analysis of historical rollover data helpfully demonstrates that

mechanical asphyxiation is a general risk associated with rollovers. However, Mr. Berry is not qualified to testify as to the actual cause of Mr. Melton's death.

Even if Mr. Berry's accident reconstruction and kinematic abilities gave him a perfect picture of the movement of the ZTR and the movement of Mr. Melton's body throughout the crash, the most he could determine is one possible cause of death. It requires medical expertise and an examination of the body to determine the *actual* cause of death.

In *Rockhill-Anderson*, the cause of death was already established. 994 F. Supp. 2d at 1229 ("Deere does not dispute that Jesse was crushed or that he died from crushing injuries, but it contests that a ROPS would have prevented Jesse's death."). Mr. Berry, of course, was qualified to testify that crushing injuries would not have been sustained if ROPS were installed. *Id.* at 1237 & n.5. He was qualified to so testify because he could opine on the kinematics and the typical risks associated with rollovers. However, he was not qualified to testify as to what *did* kill the victim.

Mr. Berry's cause of death opinion is due to be excluded.

## V.  MOTION FOR SUMMARY JUDGMENT

### A.  <u>Standard of Review</u>

To succeed on a motion for summary judgment, the moving party must demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court views

24

the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact. *Id.* Alternatively, a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. . . . [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").

If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. *Celotex Corp.*, 477 U.S. at 324. A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental*

*Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

**B.**   **Discussion**

Under Count I of Plaintiff's Amended Complaint, she alleged that Defendants violated the Alabama Extended Manufacturer's Liability Doctrine because the ZTR was defective in its lack of ROPS, lack of adequate steering and braking system, and lack of warnings.  (Doc. # 27 at 9.)  The same defects are alleged in Counts II and III.  (Doc. # 27 at 9–11.)  Defendants argue that Plaintiff cannot present evidence to support the steering and braking claims, (Doc. # 43 at 8), and Plaintiff agrees: "While the zero-turn mower's braking and steering issues may be relevant to show the necessity of a ROPS, Plaintiff concedes that Husqvarna is entitled to summary judgment on a an (sic.) AEMLD/negligence/wantonness claim based on allegation of a braking/steering defect."  (Doc. # 49 at 20.)  Accordingly, Defendants are entitled to summary judgment on all of Plaintiff's claims to the extent that they are based on a steering or braking defect.

Genuine disputes of material fact preclude summary judgment in any other respect.  Accordingly, the remaining portions of Defendants' motion are due to be denied.

## VI. CONCLUSION

For the reasons stated above, it is ORDERED that Defendants' Motion to Exclude Certain Opinions of Plaintiff's Expert Thomas Berry (Doc. # 41) is

GRANTED IN PART and DENIED IN PART, Defendants' Rule 702 Motion to Exclude Plaintiff's Cause of Death and Injury Opinions (Doc. # 42) is GRANTED, and Defendants' Motion for Summary Judgment (Docs. # 43, 44) is GRANTED IN PART and DENIED IN PART as follows:

1.     At trial, Mr. Berry may not opine that the ZTR was defective without ROPS.  He may not give any opinion that is substantially equivalent to that opinion of defect, such as saying that ROPS "should have been included" or that ROPS "should have been standard equipment rather than optional equipment."

2.     Mr. Berry may not opine as to the corporate knowledge or intent of Defendants.

3.     Mr. Berry may opine that ZTRs are often used in sloped environments by consumers and that consumers often overestimate the ZTR's ability to operate on slopes, but he may not testify that Defendants did foresee or should have foreseen the misuse.

4.     Mr. Berry may testify as to the risks posed by the ZTR, whether those risks were identified in the product's warnings, and whether the warnings can therefore be described as complete or accurate, but he may not testify as to an alternative warning or attempt to engage in a warning redrafting exercise.

5.     Mr. Berry may not testify that ROPS is "99 percent" effective in preventing serious injuries and death on ZTRs or that rollovers are the cause of death

in "90 percent" of fatal accidents involving ZTRs, but he may testify that rollovers are the "number one cause" of death in ZTR accidents.

6.    Mr. Linville may not deliver opinion testimony as to the cause of death of Mr. Melton.

7.    Mr. Berry may not deliver opinion testimony as to the cause of death of Mr. Melton, but he may testify that mechanical asphyxiation is a risk generally associated with a ZTR rollover and he may testify as to his kinematic analysis of the crash.

8.    Summary judgment is GRANTED as to all claims based on steering or braking defects in the ZTR.

9.    Summary judgment is DENIED as to all other claims.

DONE this 16th day of December, 2021.

                                           /s/ W. Keith Watkins
                                   UNITED STATES DISTRICT JUDGE